586 So.2d 714 (1991)
John J. PECK, Jr., Plaintiff-Appellee,
v.
PROCTER & GAMBLE MANUFACTURING COMPANY, Defendant-Appellant.
No. 90-261.
Court of Appeal of Louisiana, Third Circuit.
October 2, 1991.
Writ Denied December 13, 1991.
*715 Chris J. Roy, and Eugene P. Cicardo, Alexandria, for plaintiff-appellee.
Bolen & Erwin, James A. Bolen, Jr., Alexandria, for defendant-appellant.
Before DOMENGEAUX, C.J., and STOKER, and LABORDE, JJ.
LABORDE, Judge.
This is a worker's compensation case. Plaintiff, John J. Peck, Jr., filed this suit against defendant, Procter & Gamble Manufacturing Company (P & G), seeking worker's compensation benefits, medical expenses, penalties and attorney's fees. After a trial on the merits, the trial court awarded plaintiff supplemental earnings benefits, medical expenses, penalties and attorney's fees. The trial court also cast defendant with all costs. From this judgment defendant appeals. We affirm the portion of the trial court's judgment awarding benefits but reverse the portion awarding penalties and attorney's fees.

FACTS
Plaintiff began working for P & G in January of 1970. He worked primarily as as a hopper handler until his termination in June of 1986. Plaintiff worked in an area where he had direct contact with detergents on a daily basis, and at various times during his employment he was exposed to enzymes used in making some of the detergents. According to Huey Duncan, who retired after working for P & G as a hopper operator for nineteen years, there was a daily accumulation of dust in the hopper area and that after running detergent for several hours it would not be unusual to be able to write in the dust on the floor. There was so much detergent dust on the floor on humid days, that the floors became slick, requiring that some type of oil dry be put on the floor. Ginger Dickerson, a former P & G employee for eight and one-half years who also filed a worker's compensation suit against that company, worked once or twice a month in the hopper area where plaintiff worked. She testified that this area was dusty and that there were frequent detergent spills there. Ms. Dickerson also testified that she witnessed the plaintiff having a coughing fit due to a spill.
From 1971 to June, 1986, when the plaintiff was discharged, his pulmonary function studies were abnormal and he generally tested positive to the skin tests for enzyme sensitivity administered by P & G from 1973 on. Plaintiff testified that he had significant breathing problems in 1980 and that while working at P & G, he suffered from shortness of breath, wheezing and coughing, especially at night. He further testified that sometimes he had eye irritations, rashes, and sore throats and that these problems improved or abated after *716 his termination. In September of 1984, plaintiff complained to the plant physician, Dr. William Brown, of a rash over his face and blurring of his eyes, symptoms which plaintiff believed were associated with his exposure to enzymes at work. In May of 1986, plaintiff asked Dr. Brown to inspect his work area for dust. Dr. Brown's log entry does not mention the conditions he observed, although he testified at trial that the work area seemed clean to him. However, according to Huey Duncan, the hopper area was dusty that day.
At times during the period when plaintiff was employed by P & G, company policy required the wearing of a forced air hood when working around enzymes. According to plaintiff, the battery operated air hoods would get weak and their windshields would fog up and sometimes dust would get inside them causing visual and breathing problems. Plaintiff also testified that when its batteries ran down, a hood wasn't of any use.
In the Spring of 1986, plaintiff was bothered by respiratory problems and on one occasion he fainted while at his son's baseball game. Plaintiff saw Dr. Brown who detected some slight changes in plaintiff's chest X-ray in addition to his abnormal pulmonary function studies. Dr. Brown referred plaintiff to Dr. Alexandre Slatkin, a pulmonary doctor in Alexandria who examined him on March 18, 1986. According to Dr. Slatkin's April 15th letter to Dr. Brown, plaintiff had, among other ailments, restrictive pulmonary disease which could well be related to his long standing history of dust exposure.
After receiving Dr. Slatkin's letter, Dr. Brown forwarded plaintiff's prior pulmonary function studies and chest X-rays. Dr. Slatkin felt that the X-rays showed diffuse but minimal reticulondar bilateral infiltrate which causes a reduction of lung capacity. He also found fibrosis or scar tissue in the left lower lobe of the lung, and he detected respiratory wheezes and impairment of plaintiff's oxygenation system. Dr. Slatkin interpreted a St. Francis Cabrini Hospital pulmonary study as showing a moderate degree of restrictive and obstructive pulmonary disease. After reviewing the additional pulmonary function studies and chest X-rays, Dr. Slatkin wrote a letter to Dr. Brown in May of 1986, attributing plaintiff's pulmonary problems to his chronic smoking. At the time of trial, plaintiff was forty-three years old and had been smoking cigarettes since he was seventeen or eighteen.
In his deposition testimony Dr. Slatkin testified that the inhalation of particles of dust, phosphates and other irritants to the lungs coupled with cigarette smoking would aggravate or accelerate pulmonary problems. He also found that plaintiff's condition was worse in April of 1986 than in January of 1986, but that his condition had improved when he was reexamined in August of 1986, some eight weeks after plaintiff had been discharged from P & G. Dr. Slatkin's finding that plaintiff's condition had improved following his termination was corroborated by lay witnesses.
Plaintiff was also examined once by Dr. Richard Hebert at the request of defendant's counsel. Dr. Hebert evaluated plaintiff's medical history and opined that plaintiff's respiratory problems were most probably caused by his being overweight and his chronic smoking habit. Dr. I. Leonard Bernstein also evaluated plaintiff's medical history at defendant's request and he too, related plaintiff's condition to his smoking.

OCCUPATIONAL DISEASE
On appeal, defendant contends that the trial court erred in awarding supplemental earnings benefits to plaintiff for his alleged occupational disease contracted while working at P & G.
The standard for appellate review of the trial court's factual findings of work-connected disability was set forth in Crump v. Hartford Accident and Indemnity Company, 367 So.2d 300, 301 (La. 1979):
"On appellate review, the trial court's factual findings of work-connected disability are entitled to great weight. They should not be disturbed where there is evidence before the trier of fact *717 which, upon the latter's reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's findings, unless clearly wrong. The reviewing court should not disturb reasonable evaluations of credibility and reasonable inferences of fact by the trial court, even though the reviewing court is of the opinion that other evaluations and inferences are as reasonable."
LSA-R.S. 23:1031.1 provides that every employee disabled by an occupational disease shall be entitled to compensation as if he received personal injury by accident arising out of and in the course of his employment. Further, LSA-R.S. 23:1031.1(B) defines an occupational disease as "only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." Thus, the threshhold question is whether plaintiff sustained an occupational disease resulting from causes and conditions characteristic of and peculiar to his particular occupation, process, or employment. This finding is one of fact. Jones v. Argonaut Inc. Co., 449 So.2d 24 (La.App. 1 Cir.), writ denied, 450 So.2d 955 (La.1984). Furthermore, the plaintiff does not have to prove causal connection to an absolute certainty. It is sufficient that plaintiff establish the cause of his disability by a reasonable probability. Laurendine v. Fischbach & Moore, Inc., 398 So.2d 1220 (La.App. 4th Cir.1981).
In the instant case, the trial court found that the plaintiff had proven by a preponderance of the evidence the causal relationship between his condition and his employment. The trial court was clearly convinced that plaintiff's condition was more probably caused or activated by his work-related exposure to enzymes than by his cigarette smoking. The trial court noted in its written Reasons for Judgment that P & G's "Enzyme Hygiene Manual" contained the following in its question and answer section.
Q. "In layman's terms, describe the health effects resulting from excessive exposure to enzymes.
A. Inhalation of excessive amounts of enzyme dust in the work environment can lead to three effects. The first, becoming skin test positive, is not an adverse health effect but an indication that the individual's predisposition and exposure were sufficient to lead to a positive skin test. The second being minor to mild irritation of the nose (rhinitis) which is transient and leaves when source of exposure is controlled. The third being a narrowing of the airways (airways obstruction) very similar to that which occurs in hay fever (pollinosis) and if exposure is sufficient, can lead to acute airways obstruction similar to an asthmatic attack. This effect can range from minor to severe depending on exposure. The condition is reversible and will respond to treatment and/or control of the exposure."
Elsewhere, the manual stated that inhalation of enzymes can cause an allergic-type respiratory response to develop characterized by congestion, runny nose, watery eyes, puffy face, throat irritation, and a decrease in pulmonary function at the onset of the symptoms. Other symptoms can include a feeling of tightness of chest accompanied by difficulty in breathing. The trial court was clearly impressed with plaintiff's testimony regarding the nature of his condition and with the testimony indicating that plaintiff's health improved when he was no longer around the enzyme dust. Weighing the medical testimony in light of the other credible evidence of a non-medical character, the trial court found that plaintiff, because of his physical limitations resulting from his disability, was entitled to supplemental earnings benefits.[1]
The trial court's factual findings as to work-related disability are entitled to great weight and should not be disturbed where the evidence before the trier of fact supports a reasonable factual basis for its findings, unless clearly wrong. Culp v. *718 Belden Corp., 432 So.2d 847 (La.1983). We are aware that both medical and lay testimony must be considered in determining disability; however, it is the trial court's function to determine the weight accorded to that testimony. Fredericks v. Associated Indemnity Corp. 401 So.2d 575 (La. App. 3rd Cir.1981).
The trial court in this case was not clearly wrong in its determination that plaintiff has carried his burden of proof. Thus, we conclude that the plaintiff established a causal relationship between his disability and his work, and that the totality of the evidence, lay and medical supports the trial court's awarding to plaintiff of supplemental earnings benefits.

PENALTIES AND ATTORNEY'S FEES
Defendant argues that the trial court erred in awarding penalties and attorney's fees under LSA-R.S. 23:1201 and 23:1201.2. Penalties are stricti juris and should be imposed only if the facts clearly negate good faith and just cause in connection with the refusal to pay. Guillory v. Travelers Insurance Co. 294 So.2d 215 (La. 1974). In order to avoid an award of penalties, the employer must demonstrate that nonpayment resulted from conditions over which it or the insurer had no control, or that it, or the insurer has reasonably controverted the right to benefits. LSA-R.S. 23:1201(E). The employee's right to such benefits will be deemed reasonably controverted if the employer or insurer had a reasonable basis for believing that medical expenses and compensation benefits were not due the employee. Chelette v. American Guarantee and Liability Insurance Inc., 480 So.2d 363 (La.App. 3rd Cir.1985). We find that based on the medical evidence regarding plaintiff's condition, that the onset of occupational disease was subject to reasonable dispute in the instant suit.
Turning to the issue of attorney's fees, we note that LSA-R.S. 23:1201.2 provides that worker's compensation claimants are entitled to reasonable attorney's fees when an employer arbitrarily or capriciously fails to provide benefits. Considering the medical and factual information available to defendant concerning the causal relationship between the work environment and plaintiff's disability, we do not find that its actions were arbitrary and capricious.
For the reasons assigned, the judgment of the trial court awarding benefits on the basis of occupational disease is affirmed. The portion of the judgment of the trial court awarding penalties and attorney's fees is reversed.
All costs of this appeal are assessed against the defendant.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
STOKER, J., dissents and assigns written reasons.
STOKER, Judge, dissenting.
With respect I dissent. I have difficulty in finding that plaintiff sustained an occupational disease when no medical expert testified that he did have such a disease. Moreover, the testimony of the medical experts preponderates in favor of a contrary conclusion. This is not to say that the plaintiff does not have pulmonary problems. The point is that the medical expert testimony showed that there are very valid reasons for plaintiff to have such problems which were in no way related to plaintiff's work at the defendant's plant.
I believe the trial court should have decided the case as the trial courts did in Kramer v. Johns-Manville Sales Corp., 459 So.2d 642 (La.App. 5th Cir.1984); Venable v. Rawlings, Inc., 471 So.2d 1132 (La. App. 3d Cir.), writ not consid.'d, 476 So.2d 340 (La.1985) and Batiste v. Johns-Manville Sales Corp., 478 So.2d 1276 (La.App. 5th Cir.1985).
NOTES
[1] We note that to qualify for supplemental earnings benefits under LSA-R.S. 23:1221(3) a plaintiff must prove by a preponderance of the evidence that a work-related injury resulted in his inability to earn wages equal to 90% or more of his wages at the time of injury.